UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

WEI LU,

      Plaintiff,

vs.                                 No. 1:13-CV-00531 WPL/ACT

KEN CHRISTESEN, Individually and in his official
capacity as San Juan County Sheriff,
SAN JUAN COUNTY SHERIFF'S OFFICE,
ALAN JAMISON, Individually and in his official capacity,
JACOB SANCHEZ, Individually and in his official capacity,
DAVID McCALL, Individually and in his official capacity,

      Defendants.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants Ken Christesen, San Juan County Sheriff's Office, Alan Jamison, Jacob Sanchez and David McCall, by and through their attorneys, Potts & Associates (Amy L. Glasser, Esq.), and hereby submit Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Plaintiff opposes this Motion.

### INTRODUCTION

Plaintiff Wei Lu has filed a Complaint in which she alleges that defendants falsely arrested her, wrongfully took her personal belongings and money during the arrest, and violated her Federal and State Constitutional rights under 42 USC §§ 1983 and 1985. Plaintiff alleges that the defendants deprived her of equal protection, due process, and violated her Fourth Amendment right to be free from unreasonable search and seizure, all of which plaintiff claims occurred because she is Asian.

The evidence in this case, however, shows that the defendants conducted a full and extensive investigation of plaintiff and her massage parlor business,

known as Asian Massage, after the nature of the plaintiff's business came to the attention of law enforcement through multiple independent and separate sources.   Based on the months-long investigation, probable cause was established and a search warrant was issued.   During the lawful search, plaintiff was arrested and evidence was recovered from her home, her vehicle and her business.

Whether or not defendants had probable cause to obtain the search warrants, arrest plaintiff, and seize evidence is a question that can and should be answered by this Court.   This is the sole determination required in granting or denying summary judgment based on qualified immunity.   The material facts are undisputed and defendants are entitled to summary judgment as a matter of law.

## STANDARD OF REVIEW

"Summary judgment procedure is properly regarded not as a procedural short cut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure a just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(quoting Fed. R. Civ. P. 1).   Under Rule 56(c), of the Federal Rules of Civil Procedure, the movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which the movant believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).   "[W]ith or without supporting affidavits," the movant may meet its Rule 56 burden by pointing out to the court that the non-movant "fail[ed] to make a showing

2

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. At 322-33; Lujan v. National Wildlife Federation, 497 U.S. 871, 884-85 (1990).

Once the movant has met its Rule 56 burden, the burden shifts to the non-moving party to establish a genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). On summary judgment, the court must view the evidence in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court, however, cannot "assume" that a disputed issue of material fact exists if there are insufficient facts to support the non-movant's allegations. Lujan, 497 U.S. at 888. By its terms, Rule 56(c) provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 248-49 (italics in original). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. Moreover, the non-movant cannot satisfy its burden with "some metaphysical doubt as to the material fact," Matsushita, 475 U.S. at 586, "conclusory allegations," Lujan, 497 U.S. at 888, unsubstantiated assertions, Wilson v. Meeks, 52 F.3d 1547 (10th Cir. 1995), or the "mere existence of a scintilla of evidence, in support of the [non-moving party's] position," Anderson, 477 U.S. at 252.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In the present case, there is no genuine issue of material fact, and defendants are entitled to summary judgment as a matter of law. The material facts to which no genuine issue exists are as follows:

1. During all times material, defendants Christesen, Jamison, Sanchez and McCall were duly sworn law enforcement officers employed by the San Juan County Sheriff's Department. Defendant Christesen was, at all times relevant, the San Juan County Sheriff. Defendants Jamison, Sanchez, and McCall were deputies assigned to the San Juan County Special Enforcement Team ("SET"). *See Complaint, ¶¶3-7.*

2. In August, 2012, Lieutenant Neil Haws, Director of Region II Narcotics, in Farmington, NM, advised defendant Sergeant Jamison that he had been receiving information regarding behaviors that seemed suspicious and likely to be involving prostitution from the "Asian massage parlor" located behind the KB Dillons restaurant. Lt. Haws requested that SET look into it. *See Declaration of Alan Jamison, Jacob Sanchez, and David McCall, attached hereto as Exhibit "A".*

3. Defendant Jamison learned that there are two massage parlors within several blocks of each other in Farmington, both of which are owned by Asians and both of which have Asian employees. One of these business is owned by plaintiff and is called "Asian Massage". *See Exhibit "A".*

4. Within a day or two of the report by Lieutenant Haws, defendant Sergeant Jamison was advised by an individual named Donny Castor that he had been going to the "Asian massage parlor" for massages and that sexual acts were also being performed on him, specifically Mr. Castor reported getting a "hand job" at the massage parlor. *See Exhibit "A".*

5.     In response to both reports, SET members initiated surveillance of both massage parlors for a couple of weeks to determine if either might be involved in illegal activities.  *See Exhibit "A".*

6.     No suspicious activity was observed in regard to the other massage parlor but SET members did observe suspicious activity in regard to Asian Massage so the focus of the investigation shifted to that business. *See Exhibit "A".*

7.     The surveillance of Asian Massage occurred from August, 2012 through October, 2012 and consisted of surveillance periods lasting 2-4 hours/day, 2-3 days/week.  During this surveillance, over the course of two months, only male customers were seen entering or leaving Asian Massage.  *See Exhibit "A".*

8.     As part of the investigation, SET members, including Deputies McCall, and Sanchez, conducted extensive research on the internet where prostitution and sexual services are frequently advertised.     Specifically, defendants researched postings on Erotic MP, Rub Map, Craigslist and Back Page which are known by law enforcement to be website commonly used in the sex industry.  SET's research revealed numerous listings, postings and links regarding plaintiff's massage parlor, including explicit reviews of the type and quality of the sexual services customers had received at Asian Massage and the cost of the sexual services provided at plaintiff's place of business.  *See Exhibit "A".*

9.     Prior to beginning the investigation, Sergeant Jamison contacted Detective Sergeant Robert Perez of the Farmington Police Department to see if any investigation of Asian Massage was already in progress.  Detective Perez

advised Sergeant Jamison that a man had gone to the police department and reported that he had innocently gone to Asian Massage for a legitimate massage and that the masseuse had attempted to touch his genitals. This information continued to reinforce SET's belief that plaintiff's business was involved in illegal activities of prostitution. *See Exhibit "A".*

10.     As part of the investigation, Deputies McCall and Sanchez went undercover to Asian Massage and presented themselves as customers. Based on their internet research, they understood that a "hand job" would cost $60.00. During their time at Asian Massage, one masseuse told defendant McCall that the massage would cost $60.00 and that she worked for "teepo". The masseuse simulated a stroking gesture as she used the word "teepo", understood by defendant McCall to mean a "hand job". Additionally, based on his research, defendant McCall understood the slang word "teepo" to mean "hand job". Sergeant Jamison monitored the undercover operation. *See Exhibit "A".*

11.     SET members also consulted with Albuquerque Police Department's Vice Squad in regard to their investigation and rode along with APD Vice for several days during which Deputies went to numerous massage parlors in Albuquerque, including one massage parlor known as Lotus Massage. The officers were solicited shortly after entering Lotus Massage and later learned that Lotus Massage is also owned by plaintiff. APD Vice and SET members also investigated another massage parlor named Ocean Spa where officers were solicited soon after entering the establishment. It was later learned that plaintiff also has an ownership interest in Ocean Spa. *See Exhibit "A".*

12.     After working with APD Vice, defendants Sanchez and McCall returned to Asian Massage in Farmington.   Defendant McCall was again solicited by a masseuse who insisted that he remove his underpants; the exchange was recorded.   In the next room, defendant Sanchez, communicating primarily with hand gestures, made a deal with the masseuse that she would give him a "hand job" in exchange for $60.00.   Sergeant Jamison monitored the undercover operation.  *See Exhibit "A"*.

13.     During their visits to Asian Massage, Deputies McCall and Sanchez noticed that no massage parlor license was posted, as required by law. They had also observed activities which made it appear that the business might be moving.   Additionally, the SET team knew that plaintiff's business license was due to expire within a month. *See Exhibit "A"*.

14.     Concerned that the business might relocate or the owner might leave the area, SET members contacted the District Attorney's Office and advised the D.A. of the investigation and the evidence collected.   The D.A determined that a search warrant of the business and of the plaintiff's vehicle should be issued.  *See Exhibit "A"*.

15.     On October 30, 2012, defendant Sanchez and Deputy Stevens went to Asian Massage to secure the business and plaintiff's vehicle based on the search warrant. *See Exhibit "A"*.

16.     When they arrived, plaintiff was with a male customer identified as Lynn Horrocks, who was wearing only his underpants.   Mr. Horrocks was taken into custody and advised the officers that he was traveling through Farmington for work and had learned of Asian Massage on the internet.  Based on reviews about the sexual services obtained by other customers, the man had

gone to Asian Massage for the purpose of obtaining sexual services. The customer admitted that he had been to Asian Massage the previous evening during which he had received a "happy ending" and intended to get another one when the police had arrived. The man stated that he believed the plaintiff was going to provide the "happy ending" during this visit. Based on training, experience, and research, Deputies Sanchez, McCall and Sergeant Jamison understood the term "happy ending" to mean completion of a sexual act. *See Exhibit "A"*.

17. Plaintiff and an employee were arrested and the business was searched. The employee, Lee Jiang, was interviewed by Deputy Sanchez with the assistance of a telephone language line used by law enforcement during which Ms. Jiang admitted to prostitution and stated that plaintiff owns the business and is fully aware of the activities that happen there. Ms. Jiang also advised that she and the other masseuses live in the plaintiff's home and offered information about which female uses which bedroom and where money they earn is kept. *See Exhibit "A"*.

18. Based on Ms. Jiang's statements, the DA approved a search warrant of plaintiff's residence. *See Exhibit "A"*.

19. Plaintiff's residence was searched and money was located where Ms. Jiang stated it would be. The bedroom identified as plaintiff's was searched and a suitcase was found under plaintiff's bed. In the suitcase, defendants found business documents, bank statements, personal documents, photographs, and internet printouts from the websites where defendants had seen Asian Massage advertised and reviewed. *See Exhibit "A"*.

20.     The printouts found in plaintiff's suitcase included reviews of sexual acts performed by individuals at Asian Massage, including the particular skills of a person identified as "Vivian". Documents in plaintiff's suitcase and in her bedroom established that plaintiff sometimes uses the name "Vivian". Additionally, the printouts in plaintiff's suitcase had handwritten notes regarding sex acts and charges for those acts, all of which defendants understood to be in plaintiff's handwriting. *See Exhibit "A".*

21.     The business records found in plaintiff's suitcase included ledgers and customer lists that were all men and bank statements that included charges to Craigslist and Back Page where sexual acts available at Asian Massage had been advertised and reviewed. *See Exhibit "A".*

## LEGAL ARGUMENTS

### I.     Defendants Are Entitled to Qualified Immunity As There was Probable Cause to Arrest Plaintiff and Seize Evidence.

In civil rights cases, qualified immunity shields governmental officials performing discretionary functions from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine if qualified immunity applies, this Court must look to whether a reasonable officer could have believed his or her conduct to be lawful in light of the clearly established law and the information possessed by the officer at the time the conduct occurred. Anderson v. Creighton, 483 U.S. 635, 641 (1987).

"To reach the question of whether the defendant official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all." Martinez v.

9

Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994)(citing Siegert v. Gilley, 500 U.S. 226, 231-32 (1991)).  To carry its burden, plaintiff must do more than identify in the abstract a clearly established right and allege that defendants violated it. Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990).  Rather, plaintiff must articulate with specificity the clearly established constitutional right and the defendants' conduct which violated that right.    Pueblo Neighborhood Health Ctrs. V. Losavio, 847 P.2d 642, 645 (10th Cir. 1988). Indeed, plaintiff must "demonstrate a 'substantial correspondence between the conduct in question and prior law...establishing that the defendant's actions were clearly prohibited.'"  Hovater v. Robinson, 1 F.3d 1065, 1066 (10th Cir. 1993) (quoting Hannula, 907 F.2d at 130).  Unless such a showing is made, defendants prevail.  Losavio, 847 F.2d at 646; see also, Hannula, 907 F.2d at 131.    The inquiry requires a determination whether the contours of the plaintiff's constitutional rights were sufficiently clear that a reasonable official in the defendant's position would understand that what he or she was doing violated the plaintiff's rights.   This inquiry is "specific and particularized". Indeed, qualified immunity operates to "ensure that before they are subject to suit, officers are on notice their conduct is unlawful."  Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001).   "[I]n addition to the deference officers received on the underlying claim, qualified immunity can apply in the event the mistaken belief was reasonable."  Id. at 2159.  "If the officers 'mistake as to what the law requires is reasonable, however, the officers are entitled to the immunity defense."  Id.

Probable cause is defined as facts and circumstances "sufficient to warrant a prudent man in believing that the [suspect] had committed or was

committing an offense." Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Similarly, "the defendant arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest plaintiff.   Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee had committed or is committing an offense." Albright v. Rodriguez, 51 F.3d 1531, 1536 (10th Cir. 1995). All facts known to the arresting officer and all reasonable inferences that could be drawn are considered.  United States v. Bernard, 623 F2d 551, 558-59 (9th Cir. 1979).

In the case at bar, defendants are entitled to qualified immunity because the comprehensive investigation of plaintiff and the evidence shows that there was probable cause to arrest plaintiff and seize evidence and because plaintiff cannot show she was arrested due to her national origin in violation of her Constitutional rights.  Defendants' comprehensive investigation, initiated by multiple independent reports of suspicious activities, actual encounters in which sexual services were exchanged for money, and extensive research established probable cause such that search warrants were issued and ultimately plaintiff was arrested and evidence was seized.   In particular, defendants conducted two weeks of surveillance of two massage parlors within a few blocks of each other to ensure which one was the massage parlor reportedly involved in illegal activities.  Defendants did not immediately jump to any conclusions based on plaintiff's national origin or any other irrelevant factor.   Rather, a comprehensive investigation ensued including months of surveillance where only male customers were seen entering and leaving

plaintiff's business, several undercover encounters during which defendants were solicited, substantial and in depth internet research during which plaintiff's business was repeatedly and routinely noted on websites that are known to advertise sexual services in which plaintiff's business was advertised, reviewed and incorporated links to sites showing what services were provided at plaintiff's business and at what prices. These websites also identified, by name, plaintiff and her employees and included reviews of the particular skills of those providing sexual services.

Defendants are fully trained and experienced law enforcement officer who are specifically trained to investigate crimes involving solicitation. Plaintiff's business, vehicle and residence were lawfully searched based on proper search warrants.  Based on their comprehensive and extensive investigation and the evidence discovered during the lawful searches, defendants had probable cause to arrest plaintiff and seize evidence.

The undisputed material facts in this case point to the conclusion that defendants had the requisite probable cause to search and seize plaintiff and her property. "The validity of an arrest does not depend on the ultimate finding of guilt or innocence following an arrest." Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).  It is not the obligation of the police officer to "conduct a mini-trial" prior to an arrest.  Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir.), *cert. denied*, 519 U.S. 867, 117 S.Ct. 179, 136 L.Ed.2d 119 (1996); see also, Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994)("Evidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law.")

(citing <u>Henry v. United States</u>, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959).

Plaintiff's contention in this case is that defendants' belief that plaintiff's massage business was involved in illegal activity was based on "surfing the internet" and "on what a guy in a bar told one of the defendants". Rather than some vague sense that some criminal activity might be occurring based on some sort of gossip or whispering, defendants' investigation stemmed from reports from multiple separate reliable sources, the Director of Region II Narcotics, a resident of Farmington personally known to Sergeant Jamison, and Detective Sergeant Robert Perez of the Farmington Police Department. These reports triggered SET's comprehensive investigation, not an immediate search and seizure of plaintiff and her property. Plaintiff was not arrested and her property was not seized until the investigation did, in fact, substantiate the initial reports that triggered the investigation. That the D.A. opted to bring certain charges, rather than others, or that charges were ultimately dismissed does not change the fact that defendants conducted a comprehensive investigation and probable cause was established. Thus, as a matter of law, defendants are entitled to qualified immunity and the claims against them should be dismissed.

### II.     There Is No Evidence that the Search and Seizure was Based on Race.

Plaintiff claims that defendants' actions constituted intentional deprivations of her clearly established equal protection, due process, and rights to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments. As established above, defendants did have probable cause to search and seize plaintiff and her property and, therefore, plaintiff's

claims related to due process and search and seizure must fail. Similarly, plaintiff's equal protection claim, too, must fail.

To establish a violation of the Equal Protection Clause of the Fourteenth Amendment, plaintiff must first show that defendants had discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 241 (1976). "To avoid interference with proper law enforcement, however, the standard for proving racial profiling 'is a demanding one'". *Marshall v. Columbia Lea Reg'l Hosp.,* 345 F.3d 1157, 1167 (10th Cir. 2003)(quoting *U.S. v. Armstrong,* 517 U.S. 546, 463, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)). Plaintiff must prove that defendants' actions were "(1) motivated by a discriminatory purpose, and (2) had a discriminatory effect." *Id.* at 1168. "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision." *Id.* A presumption exists that there is no violation of equal protection rights and, in order to dispel this presumption, a plaintiff must present "clear evidence to the contrary". *Id.*

In this case, plaintiff's allegation of discriminatory intent is based on how defendants communicated with plaintiff's employees during the investigation, via hand gestures and use of slang terminology, and a general allegation that defendants' intentionally targeted plaintiff based on her Asian heritage and business. However, plaintiff offers no specific or clear evidence that the investigation of plaintiff and her business was racially motivated or was done with a discriminatory intent.

Plaintiff must do more than provide only conclusory allegations or "abstractly identify an established right". "Plaintiff must specifically identify the right and conduct....which violated that right." *Lighton v. University of Utah,*

209 F.3d 1213, 1221. This is even more so with respect to the alleged conspiracy to violate rights to non-discriminatory treatment. *Lewis v. Denver Fire Department*, 2011 WL 6841530 (D.Colo.).

### III. San Juan County and Sheriff Christesen Are Entitled to Dismissal as Defendants had Probable Cause.

A municipality cannot be held liable for the acts of its officers if the officer did not violate the rights of or cause harm to the plaintiff. As the Court in City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) held, "neither Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the action of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." Because defendants had probable cause to search and seize plaintiff and her property, they did not, as a matter of law, inflict any constitutional injury on plaintiff. Therefore, defendant San Juan County Sheriff's Department cannot be liable to plaintiff and is entitled to dismissal.

Similarly, in order to hold Sheriff Christesen liable, plaintiff must first present evidence of an underlying constitutional violation and then must present evidence that the Sheriff was responsible for that violation. *See e.g., Hinton v. City of Elwood*, 997 f.2d 774 (10th Cir. 1993). Because there is no constitutional violation, plaintiff's claim against defendant Christesen necessarily fails.

Even if there had been a constitutional violation, plaintiff cannot show any liability of defendant Christesen under *Monell*. Plaintiff cannot show any custom or policy of the Sheriff that led to the alleged constitutional violations.

Nor can plaintiff show that the Sheriff provided inadequate training that amounts to deliberate indifference to the plaintiff's constitutional rights. *See Carr v. Castle,* 337 F.3d 1221, 1228 (10th Cir. 2003).

WHEREFORE, Defendants Christesen, Sanchez, McCall, and Jamison and San Juan County Sheriff's Office respectfully move for summary judgment and dismissal of this case in its entirety and for such further relief deemed just under the circumstances.

Respectfully submitted:

POTTS & ASSOCIATES

"Electronically filed"

By: */s/Amy L. Glasser*
AMY L. GLASSER
6001 Indian School Rd. NE #100
Albuquerque, NM  87110
Telephone: 505-889-5252
Facsimile:  877-365-8043
*Attorney for Defendants*

I HEREBY CERTIFY that on September 13, 2013,
I filed the foregoing pleading electronically through
the CM/ECF system, which caused the following
parties or counsel of record to be served by electronic or other
means, as more fully reflected on the Notice of Electronic Filing:

Christian Hatfield, Esq.
Tucker, Burns, Yoder & Hatfield
105 N. Orchard Ave.
Farmington, NM  87401
christian@tbylaw.com

    */s/ Amy L. Glasser*
AMY L. GLASSER

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

WEI LU,

     Plaintiff,

vs.                          No. 1:13-CV-00531 WPL/ACT

KEN CHRISTESEN, Individually and in his official
capacity as San Juan County Sheriff,
SAN JUAN COUNTY SHERIFF'S OFFICE,
ALAN JAMISON, Individually and in his official capacity,
JACOB SANCHEZ, Individually and in his official capacity,
DAVID McCALL, Individually and in his official capacity,

     Defendants.

## DECLARATION OF ALAN JAMISON, JACOB SANCHEZ, and DAVID McCALL

     I, Alan Jamison, affirm that I am over the age of eighteen, am competent to make this declaration, and do so based on my personal knowledge.

     I, Jacob Sanchez, affirm that I am over the age of eighteen, am competent to make this declaration, and do so based on my personal knowledge.

     I, David McCall, affirm that I am over the age of eighteen, am competent to make this declaration, and do so based on my personal knowledge.

     1.    At all times material to the Complaint, we have been a trained and certified law enforcement officer in the State of New Mexico working as deputies with the San Juan County Sheriff's Office.

     2.    At all times material to the Complaint, we were members of the San Juan County Sheriff's Office Special Enforcement Team (SET).

     3.    In August, 2012, Lieutenant Neil Haws Director of Region II Narcotics, in Farmington, NM, advised Sergeant Jamison that he had been receiving information regarding behaviors that seemed suspicious and likely to be involving prostitution from the Asian Massage Parlor behind the KB Dillons restaurant. Lt. Haws



EXHIBIT A

advisedthat Region II Narcotics was too busy to look into the massage parlor and asked if the S.E.T Team be interested in helping.

4.    Following the report by Lt. Hawes, Sergeant Jamison learned that there are two massage parlors within several blocks of each other in Farmington, both of which are owned by Asians and both of which have Asian employees. One of these businesses is called "Asian Massage" and is owned by plaintiff Wei Lu.

5.    Within a week or two of the report by Lt. Haws, Sergeant Jamison was advised by an individual named Donny Castor that he had been going to the "Asian massage parlor" for massages and that sexual acts were also being performed on him. Specifically, Mr. Castor reported getting a "hand job" at the massage parlor.

6.    In response to both reports, the SET team initiated surveillance of both massage parlors for a couple of weeks to determine which, if either, might be involved in illegal activities.

7.    No suspicious activity was observed in regard to the other massage parlor. SET members did observe suspicious activity in regard to Asian Massage so the focus of the investigation shifted to that business.

8.    The surveillance of Asian Massage occurred from August, 2012 through October, 2012 and consisted of surveillance periods lasting 2-4 hours/day, 2-3 days/week. During this surveillance, over the course of two months, only male customers were seen entering or leaving Asian Massage.

9.    As part of the investigation, SET members, including Deputy McCall, and Deputy Sanchez, conducted extensive research on the internet where prostitution and sexual services are frequently advertised. Specifically, we researched postings on Erotic MP, Rub Map, Craigslist and Back Page which we know to be websites commonly used in the sex industry. SET's research revealed numerous listings,

postings and links regarding plaintiff's massage parlor, including explicit reviews of the type and quality of the sexual services customers had received at Asian Massage and the cost of the sexual services provided at plaintiff's place of business.

10.   Prior to beginning the investigation, Sergeant Jamison contacted Detective Sergeant Robert Perez of the Farmington Police Department to make sure an investigation was not already in progress and was advised that an unidentified man had gone to the police department and reported that he had innocently gone to Asian Massage for a legitimate massage and that the masseuse had attempted to touch his genitals.  This information continued to reinforce our belief that plaintiff's business was involved in illegal activities of prostitution.

11.   As part of SET's investigation, Deputies McCall and Sanchez went undercover to Asian Massage and presented themselves as customers.  Based on our internet research, we understood that a massage would cost $60.00.  During the deputies' time at Asian Massage, one masseuse told Deputy McCall that the massage would cost $60.00 and that she worked for "teepo".  The masseuse simulated a stroking gestureas she used the word "teepo", understood by Deputy McCall to mean a "hand job".  Additionally, based on his research, Deputy McCall understood the slang word "teepo" to mean "hand job".  Sergeant Jamison monitored the undercover operation.

12.   The SET members also consulted with Albuquerque Police Department's Vice Squad in regard to their investigation and rode along with APD Vice for several days during which Deputies went to numerous massage parlors in Albuquerque, including one massage parlor known as Lotus Massage.  The officers were solicited shortly after entering Lotus Massage and later learned that Lotus Massage is also owned by plaintiff.  Another massage parlor identified as the Ocean Spa was also

investigated while working with APD Vice. Undercover Officers were solicited soon after entering this establishment as well. It was later uncovered that the Plaintiff also had an interest in this business as well.

13.     After working with APD Vice, Deputies Sanchez and McCall returned to Asian Massage in Farmington. Deputy McCall was again solicited by a masseuse who insisted that he remove his underpants; the exchange was recorded. In the next room, Deputy Sanchez, communicating primarily with hand gestures, made a deal with the masseuse that she would give him a "hand job" in exchange for $60.00. Sergeant Jamison monitored the undercover operation.

14.     During their visits to Asian Massage, Deputies McCall and Sanchez noticed that no massage parlor license was posted, as required by law. They had also observed activities which made it appear that the business might be moving. Additionally, the SET team knew that plaintiff's business license was due to expire within a month.

15.     Concerned that the business might relocate or the owner might leave the area, the SET members contacted the District Attorney's Office and advised the D.A. of the investigation and the evidence collected. The D.A determined that a search warrant of the business and of the plaintiff's vehicle should be issued.

16.     On October 30, 2012, Deputy Sanchez and Deputy Stevens went to Asian Massage to secure the business and plaintiff's vehicle based on the search warrant.

17.     When they arrived, plaintiff was with a male customer identified as Lynn Horrocks, who was wearing only his underpants. The customer was questioned, and advised the officers that he was traveling through Farmington for work and had learned of Asian Massage on the internet. Based on reviews about the sexual services obtained by other customers, the man had gone to Asian Massage for the purpose of

obtaining sexual services.  The customer admitted that he had been to Asian Massage the previous evening during which he had received a "happy ending" and intended to get another one when the police had arrived.  The man stated that he believed the plaintiff was going to provide the "happy ending" during this visit.  Based on training, experience, and research, Deputies Sanchez, McCall and Sergeant Jamison understood the term "happy ending" to mean completion of a sexual act.

18.    Plaintiff and an employee were arrested and the business was searched. The employee, Lee Jiang, was interviewed by Deputy Sanchez with the assistance of a telephone language line used by law enforcement during which Ms. Jiang admitted to prostitution and stated that plaintiff owns the business and is fully aware of the activities that happen there. Ms. Jiang also advised that she and the other masseuses live in the plaintiff's home and offered information about which female uses which bedroom and where money they earn is kept.

19.    Based on Ms. Jiang's statements, the DA approved a search warrant of plaintiff's residence.

20.    Plaintiff's residence was searched and money was located where Ms. Jiang stated it would be.  The bedroom identified as plaintiff's was searched and a suitcase was found under plaintiff's bed.  In the suitcase, officers found business documents, bank statements, personal documents, photographs, and internet printouts from the websites where defendants had seen Asian Massage advertised and reviewed.

21.    The printouts found in plaintiff's suitcase included reviews of sexual acts performed by individuals at Asian Massage, including the particular skills of a person identified as "Vivian".   Documents in plaintiff's suitcase and in her bedroom established that plaintiff sometimes uses the name "Vivian".   Additionally, the

printouts in plaintiff's suitcase had handwritten notes regarding sex acts and charges for those acts, all of which defendants understood to be in plaintiff's handwriting.

22.     The business records found in plaintiff's suitcase included ledgers and customer lists that were all men and bank statements that included charges to Craigslist and Back Page where sexual acts available at Asian Massage had been advertised and reviewed.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Sergeant ALAN JAMISON

Signed on this _____ day of September, 2013.

_____
Deputy JACOB SANCHEZ

Signed on this _____ day of September, 2013.

_____
Deputy DAVID McCALL

Signed on this _____ day of September, 2013.