UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

WEI LU,

              **Plaintiff,**

vs.                                        No. 1:13-CV-00531 WPL/ACT

**KEN CHRISTESEN,**
**Individually and in his official capacity**
**As San Juan County Sheriff**
**& San Juan County Sheriff's Office,**
**Alan Jamison,**
**Individually and in his official capacity,**
**Jacob Sanchez,**
**Individually and in his official capacity**
**David McCall,**
**Individually and in his official capacity,**
**SAN JUAN COUNTY,**
              **Defendants,**

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant, pursuant to F.R.C.P. 56, submits this Response to Defendants' Motion for Summary Judgment argues for dismissal of plaintiff's claims, including non-federal claims, on qualified immunity grounds. Rather than listing only undisputed facts supported by affidavits of personal knowledge, defendants submit in support a joint affidavit by three of the defendants comprising an admixture of personal knowledge, uncontested and contested facts, incomplete facts, hearsay (including multiple-level hearsay) and argument, much of which should be stricken under F.R.C.P. 56. Defendants' characterization of all their actions as reasonable through the mantra-like repetition of the phrase "extensive investigation" illustrates a number of disputed material facts in the case. The motion tends to support plaintiff's allegations that these defendants do not readily admit mistakes, but re-characterize facts that don't support their conclusions. Any different view of the facts, according to defendants, is wrong. *See, e.g.,*

1

Motion p. 13. ("That the D.A. opted to bring certain charges, rather than others, or that charges were ultimately dismissed does not change the fact that defendants conducted a comprehensive investigation . . .").

Qualified immunity fails in this case because (1) many of the most salient facts in this case are disputed, (2) there are highly contested issues of credibility, and (3) there is evidence of intentional and highly unreasonable conduct by defendants that fails the objective reasonableness standard.

### SUMMARY JUDGMENT STANDARD

The court's role in summary judgment proceedings is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505. The court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. *Hunt v. Cromartie,* 526 U.S.541, 550-55, 119 S.Ct. 1545; *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (emphasis added). The court cannot decide issues of credibility.

Qualified immunity shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Consideration of qualified immunity involves a two-step analysis. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009). When a defendant asserts qualified immunity at summary judgment the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th

Cir. 2009). The analysis for each claim of constitutional violation should be considered separately. *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012). Once a plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. *See Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 870-71 (10th Cir. 1993).

As the 10th Circuit has observed, there will "almost never be a previously published opinion involving the exact same circumstances." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (cited in *Morris*, 672 F. 3d at 1197). Accordingly, courts have adopted a sliding scale approach: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. *Morris*, 672 F. 3d at 1196-1197 (quoting *Pierce v. Gilchrist*, 359 F. 3d 1279, 1298 (10th Cir. 2004) ("[W]hen an officer's violation ... is particularly clear ..., [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law." *Casey*, 509 F.3d at 1284).

In determining whether the plaintiff has met her burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party. *Scott v. Harris, 550 U.S. 372*, 378-80, 127 S.Ct. 1769 (2007); *Riggins v. Goodman*, 572 F.3d at 1101, 1107, 1107 (noting that the Tenth Circuit " accept[s] the facts as the plaintiff alleges them" ). "[T]his usually means adopting ... the plaintiff's version of the facts," *(Scott,* 550 U.S. at 378), unless that version " is so utterly discredited by the record that no reasonable jury could have believed him," *Id.* at 380.

"Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense had been committed by the person arrested."

3

*United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010). The probable cause inquiry is an <u>objective</u> one. *Howards v. McLaughlin*, 634 F.3d 1131, 1142 (10th Cir. 2011) (emphasis added). If a reasonable officer would not have arrested plaintiff for these offenses, qualified immunity fails. *Id.*

## DECLARATORY RELIEF

Plaintiff has also moved for declaratory relief—requesting the return of her money and belongings. Compl. p. 9. There is no qualified immunity for such claims. *Presbyterian Church (USA) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989).

## FACTS/ ARGUMENT

Defendants' characterization of the facts is more akin to an argument as to what facts should be considered. With regard to each numbered paragraph in the motion:

1. The parties do agree that the defendants were all law enforcement officers acting in their official capacities at all times relevant to the conduct described in the Complaint.

2. Defendants assert (based on hearsay from another officer) that "suspicious activity may have been taking place at plaintiff's business." It is undisputed that the defendants have and are suspicious; adding another officer's alleged suspicion adds little to the mix.

3. Defendants assert that there are two massage parlors within several blocks of each other in Farmington, "both of which are owned by Asians and both of which have Asian employees." Plaintiff is actually an American citizen--a distinction lost on defendants—but plaintiff has no reason to dispute the existence of the other business nor any information about what, if any, investigation of that business has taken place.

Plaintiffs allegation in the Complaint (Compl. ¶ 14) that no investigation and targeting of this magnitude has ever taken place in San Juan County with regard to any non-Asian-owned

4

massage parlor remains uncontradicted.

Plaintiff does not dispute that she owns the Asian Massage business.

4. Defendant Jamison says a Donny Castor told him that he went to the "Asian massage parlor" where he received a "hand job." Defendants have produced no information about this witness, nor is it clear he was talking about plaintiff's business, as opposed to another "Asian massage parlor."

Defendants repeatedly confuse Asian Massage, plaintiff's business in Farmington, with the generic term 'Asian massage' or 'oriental massage.' Exhibit 1 hereto is an example of plaintiff's legitimate online advertising. Exhibit 2 appears to be a pornography aggregation site for people who enjoy "Asian massage" and post internet comments under anonymous or assumed names (*See also* Ex. 15 and discussion of para. 8, below). Ex. 1 is advertising that plaintiff pays for. Ex. 2 is something plaintiff has nothing to do with and no control over, as it is the internet.

Regardless of what Mr. Castor said, or what anyone posted on the internet, defendants interviewed other witnesses who provided the opposite information. Defendants' repeated emphasis on only the facts that support their conclusion, as opposed to the evidence of plaintiff's innocence skews the facts. The statements of Raul Calderson, for example (Ex. 3) (from SET surveillance reports):

> A male named Raul Calderon exited Asian Massage and was followed by SET operatives to his home, where he was interrogated. "Raul Calderon agreed to speak with us. He said that he got a one hour massage today at Asian Massage. He also said that he got a one hour massage approximately 2 weeks ago. He paid $60 each time he got a massage.
>
> Raul said that both times he got a massaged; he disrobed completely, at the direction of the Asian female that performed the massage.
>
> Raul said that he works construction, and he gets massages to help him ease the

5

> tension from a hard day of work. <u>Raul said that he was not solicited for prostitution of any kind, and he also did not solicit the masseuse. He did say that if a "Happy Ending" was offered, he would have been interested</u>.

(emphasis added). This is one of a number of reports defendants obtained demonstrating that plaintiff ran a legitimate massage business. *See, e.g.*, discussion at ¶ 8, below.

Defendants' extensive surveillance of plaintiff's home, car, business, phone, computers, bank records and more also overwhelmingly indicated plaintiff was operating a legitimate massage business. That did not fit defendants' theory, so, rather than modify their original hypothesis, defendants ignored and manipulated facts.

Exhibit 4, containing a small sample of the surveillance reports, gives an idea of the sheer innocuousness of the conduct defendants observed :

August 29, 2012 report:

1504 hours, surveillance began

[description of people coming and going, their cars]

At 1640 surveillance ends.

At 1910 surveillance begins.

[description of people coming and going, their attire, their cars]

September 12 report: Same

August 26, 2012 report:

2240 rouse [sic] was executed . . . 2246 hours rouse [sic] was executed and Deputy C. Johnston uses one of the females [sic] phone to call 911." 2243 hours Deputy Francisco and Deputy Templeton arrive on scene to take call.  2253 Deputies leave the scene.

These reports continue in the same vein for months, pages and pages of reports, hours of audiotape and videotape surveillance, etc. The extensive nature of the surveillance is undisputed (Defs. Aff. ¶ 7). Defendants did not note anyone so much as littering or spitting on a sidewalk.

5. Paragraphs 5, 6, and 7 of the motion contain more conclusions regarding the extensive surveillance, lasting several months for periods of 2-4 hours, 2-3 days a week. *Id.* In addition to the written reports, Defendants took hours of audiotape and videotape, still photographs, database searches, GPS tracking, cell phone and bank records, WalMart security video and more. *See, e.g.* Exhibit 5 (still photograph).

The results of this surveillance, vast amounts of personnel hours and public expense in pursuit of probable cause for a <u>petty misdemeanor</u> that defendants dubbed "*Operation Asian Thunder*"? <u>Zero</u> evidence of illegal activity.

Over and over again, defendants reported they believed they could find evidence of illegal activity, seeking and obtaining multiple search warrants, supported by statements such as:

> I believe that the DVR [in plaintiff's business] will contain video recordings of the sexual acts performed by Wei Lu and her employees on clients that visited the business . . . I believe this because the video angles that were observed on the screen show a partial view of each massage room.

Sanchez Aff. for Search Warrant 11/13/12, Ex. 6.

Or Sanchez' Affidavit in support of search of Wei Lu's cell phone data (Ex. 7):

> I believe that the phone contains text messages to and from the masseuses and possibly reviews to the websites we found being utilized for Asian Massage . . . the information gathered will assist in obtaining information that she is running and has knowledge of prostitution going on in the business. It will also be possible to obtain pictures and vides of the known prostitution that was ongoing."

Both warrants were granted. The fact that defendants do not list a single item seized as a result is mentioned in their affidavit (with the exception of the internet postings discussed below) is a strong indication of what defendants found. But defendants persisted. In the absence of any probable cause of criminal activity, they said they found a "suspicious" fact: "only male customers were seen entering or leaving Asian Massage." Motion ¶ 7.

Still lacking evidence of a crime, SET operatives set about creating one, which is when

their case changed from a good-faith if overly credulous investigation to something else. Defendants, lacking evidence plaintiff was engaged in prostitution—a petty misdemeanor—began to supply courts and prosecutors with statements suggesting plaintiff might be guilty of a full misdemeanor, operating without a valid license. McCall's sworn Affidavit for Warrant (Ex. 8) gives as the <u>first</u> basis for probable cause:

> I spent a moment in the lobby/waiting area, looking for a massage license, because in my training I had learned that a massage license must be displayed in a conspicuous place for customers to examine.

McCall Aff. in Support of Search Warrant dated 10/30/12. McCall's sworn Aff. for Arrest Warrant dated 10/30/12 (Ex. 9) contains identical language. *Id.*

As does the criminal complaint, filed November 1, 2012 (Ex. 10):

Count 2

> that on or about the 30th day of October, 2012, in San Juan County, New Mexico, the above-named defendant did provide or offer to provide massage therapy for compensation without documentation that she was a massage therapist.

*License or Registration Required*, NMSA 1978 § 61-12C-5 (Ex. 11) provides:

> A. A person shall not provide or offer to provide massage therapy for compensation unless that person is a massage therapist.

<u>The problem is this was never true. At all relevant times hereto, defendants knew that plaintiff was fully licensed by the State of New Mexico</u>. Ex. 12 is a facsimile transmission from the Clerk, City of Farmington, to Devin Verlhurst, San Juan County Sheriff's Department, with New Mexico Regulation and Licensing Department confirmation that Wei Lu's state massage license was valid through 10/31/2012—the date the criminal complaint was filed—including her state licensure number. *Id.* Sheriff's deputies had this information no later than September 10, 2012, before the search warrants, before the arrest warrant, before the prosecution. *Id.*

Exhibit 13 is plaintiff's City of Farmington license that defendants received the same day,

showing that her license to operate a business with the city was current through the end of 2012. Exhibit 14 is Wei Lu's current massage license, showing that she renewed her 2012 license on October 23, 2012, and was at all times current. Of Exs. 12-14, only the first two were provided by defendants in initial disclosures. Ex. 14 is publicly available on the State of New Mexico Regulation and Licensing's web site.

The clear inference from these documents and defendants extensive internet researching abilities (Defs. Aff. ¶ 8), show that plaintiff's massage license was valid at all times up to and including the present, but indisputably through October 31, 2012. They focused on that date and did not say that plaintiff's license was up for renewal on that date, and <u>had been renewed</u>, because that would not be probable cause for anything. Indeed, when they arrested Wei Lu, she told them that her brand new license was in her purse. Defendants ignored her, knowing full well that she had a valid license.

Defendants obliquely concede this fact in their motion, saying "the SET team knew that plaintiff's business license was due to expire within a month." Defs' Aff. ¶ 14. And,

> Concerned that the business might relocate or the owner leave the area, the SET members contacted the District Attorney's Office and advised the D.A. of the investigation . . . The D.A. determined that a search warrant of the business and of plaintiff's vehicle should be issued.

*Id.* ¶ 15.

In other words, defendants suggested that plaintiff was operating without a license, was a prostitute, and was a flight risk. Had defendants not misled the D.A. with "facts," and the D.A. not signed off, it is unlikely that any district judge would have determined there was good probable cause. The justification for the searches, seizures, arrest and prosecution of plaintiff was manufactured.

    6. *See above.*

7. *See above.*

8. Defendants attempt to characterize their internet surfing of prostitution and porn-related sites as "extensive research."

> SET's research revealed numerous listings, postings and links regarding plaintiff's massage parlor, including explicit reviews of the type and quality of the sexual services customers had received as Asian Massage . . .

In support, they attach their own affidavit saying the same thing. Defs. Aff. ¶ 8.

The actual internet reviews to which they refer (Ex. 15), suggest otherwise. They refer to Albuquerque massage parlors ("This is one of my favorite massages in Albuquerque[]") (*Id.*) and contain statements that the massages were legitimate, non-sexual massages,

> May was nice and friendly and gave an excellent massage. Teased me some rubbing around the area and stuff but no extras.

*Id.*

> Rubbed around down there and got me all excited and goes "all done write your name down and the 10th massage is free." Don't think I'll be going back, had to go to work with blue balls. Lol."

*Id.*

> Good if you want a straight legit massage.

*Id.* Even ignoring the "we-read-it-on-the-internet-so-it-must-be-true" aspect of defendants' internet surfing, defendants neglect to mention that the postings on the internet sites were not posted by plaintiff and many related to Asian Massages generally. *Id.*

Moreover, such reviews are largely fantasy. Ex. 16A, the affidavit of Glenn Hayes (who posted online as "Viejo," or "Old") demonstrates the obvious truism that some of what you read on the internet is untrue. As Hayes says, the online review sites have many buttons for things like "ass play" and "breast play" etc. It's easier to get to the end by simply clicking "yes." *Id.*

The Affidavit of Tony Madral (Ex. 16B), another of plaintiff's customers, is consistent

with Hayes' statements. Madral has been a regular customer of plaintiff's, never witnessed illegal activity at the business, and never been solicited for sex.

So, too the affidavit of Steve Gathings (Ex. 16C). Not only has Gathings been a weekly, long-term customer, his wife also gets massages at plaintiff's business, refuting defendants' theory that plaintiff's only customers are men. *Id.* So defendants initial suspicions are disputed, as are the facts from their follow-up investigation.

9. Defendants go on to claim (again not on personal knowledge), that someone told a Farmington Police officer, who told them, that someone at Asian Massage touched his genitals. Improbable as that sounds, and ignoring the obvious questions that would arise if someone wandered into a police station and said such a thing, the extensive investigation apparently fell flat at this point. Discovery may provide further information as to the identity of this tipster and whether his actual testimony is actually more akin to Mr. Calderon's. More likely, he will never be located.

10. Exhibit 17 is the actual audiotape of Defendant McCall in a room with a massage therapist, in his underwear, wearing a wire. The interaction he has with the woman is awkward and there is a clear language barrier. The word McCall describes as "teepo," sounds on the audiotape a lot like "people" as in "I work for people." "I work for you."

Regardless of what the woman actually said, or meant, this is what McCall swore under oath:

> She said "I work for you for "Teepo." I asked her what Teepo meant. . . . I asked her if that meant she worked for tips. She said "Yes, Teepo. Tip."

McCall Aff. Ex. 18, p. 3. *See also* Ex. 19, McCall Aff. In other words, "I will perform a sex act for a tip."

That would, at least, be a clear allegation of solicitation for a tip. McCall, however also

11

swears under oath to a completely different, unrelated and tortured explanation of what the woman said,

> I later researched "Teepo" on the internet, and found the following on a website called Beijing made easy: The other, politer way to ask for a hand job is tuiyou, literally, to 'push oil,' which refers to a specific kind of massage which is generally understood to include a hand job. Your masseuse might well appreciate your using this politer phraseology."

*Id.*

Very little about this definition makes sense. The online site McCall refers to is Beijing Made Easy, the Online Visitors Guide to Beijing. Ex. 19. A search of that site for anything sounding like "teepo" returns no results. *Id.* This being an extensive investigation, McCall must have continued to input words until he found one that, while not sounding anything like "teepo," starts with the same letter. The new word—tiuyou—which is pronounced much like it sounds (Ex. 8, McCall Aff.), would be a grammatically improbable thing to say, as in "I work for push oil," especially in an inflected language.

Plus it is wholly illogical. McCall told the woman he was an oilfield worker. Ex. 17. The last thing a Chinese-speaking sex worker would say to subtly hint that she was ready to provide favors would be an obscure idiomatic phrase in Chinese with an obscure double meaning that sounds nothing like the word the woman said.

Also, nothing about a tip.

Other logical inconsistencies in McCall's accounting of the exchange abound. After McCall and the woman supposedly sealed the deal for the hand job—nothing. As McCall put it, "The massage continued while I was lying on my stomach." Ex. 20. No discussion of the supposed deal, no further mention of sex. Finally, as McCall is leaving, the woman offers to give him a portion of some of his money back because he did not stay for a full 60-minute massage.

*Id.* Unusual behavior for a prostitute.

Similarly, McCall asks the woman whether she has any "hobbies" and she says "Happy?"

. . .

Then, "Happy? You want Happy?"

. . .

"You would do that?"

. . .

There is giggling and a long silence, then conversation about McCall's children and other small talk. Ex. 17. So McCall's version of events is highly disputed, including what the woman said and whether McCall's interpretation has any validity.

11.  *See* paragraph 5, above. Defendants' admission of providing misleading facts to courts is alone enough to defeat any claims of qualified immunity, unless the court accepts that intentionally mischaracterizing facts to a judge is objectively reasonable. Defendants even go so far as to argue that they had probable cause for all their actions <u>because</u> a prosecutor and judge signed off on their warrants.

McCall's affidavit <u>in this case</u> again states that he "inspected the massage room and []did not find a massage license." Compl. ¶ 19. This is similar to his earlier sworn statements, and is a wholly undisputed and misleading fact. The statement suggests there might not <u>be</u> a valid license, but McCall knew that there was. This is similar to an officer making the statement, "I saw the suspect pull something out of his pocket that could have been a weapon," while failing to mention that he had seen the suspect put a banana in his pocket seconds earlier.

12. McCall again refers to the "teepo" comment discussed above and says he was solicited for sex. His credibility will clearly be a factor at trial, including whether any reasonable

fact finder could agree with his interpretation of what the woman said in either version (tip or push oil).

Defendant Sanchez, meanwhile, maintains that he was simultaneously being solicited for sex, but <u>communicated largely by hand gestures</u> (Defs. Aff. At 12), <u>while conducting covert audiotape recording seeking to gain evidence of prostitution.</u>

Ex. 9 consists of copies of contracts that Wei Lu had each massage therapist sign as a condition of employment at Asian Massage, stating that no sexual conduct of any kind would be tolerated.

13. Defendants state that Horrocks told them that he had received a happy ending. They fail to mention that Horrocks also told them he was massaged by Wei Lu, who did not perform a happy ending. Ex. 18 McCall Aff. dated 10/30/13.

14. It is undisputed that plaintiff and Wei Lu were arrested. Li Jiang's "confession," pursuant to the New Mexico Truthful Interrogation Act (or not), has never been produced, but the court may take judicial notice of her expeditious prosecution, conviction, and removal by ICE to El Paso, and the equally expeditious return and dismissal of those charges.

15. True.

16. Plaintiff does not dispute that she routinely checks web sites where her business is mentioned. Or that she contacted Glenn Hayes about such postings.

17. *See* above.

18. As discussed above, the D.A. approved a search warrant based on the representations and characterizations made by defendants under oath. that nothing seized in any of the raids on plaintiff's business, home, phone, car, computers and other belongings advanced the defendants any further toward their goal of demonstrating plaintiff was guilty of a crime.

The information and items seized are too numerous to be included here, but are consistent with the surveillance reports attached and with the dismissal of all criminal charges.

19. *See* above. It is not disputed that defendants had suspicions about plaintiff and have represented in affidavits that other officers in Farmington, Region II and Albuquerque Vice also told them they were suspicious, and that anyone who has a different view of the facts is incorrect.

20. The tautological assertion that defendants considered plaintiff suspicious, were told by other officers they were suspicious as well, and are still suspicious, even though the courts and others disagree with them is simply a statement that they were suspicious. It is undisputed that they were suspicious.

21. *See* discussion of internet reviews above.

The allegation that "business records found in plaintiff's suitcase . . . included charges to Craigslist and Back Page where sexual acts available at Asian Massage had been advertised and reviewed[]" is untrue. See Exs. 1, 2. Plaintiff's legitimate advertisements in Craig's List and Backpage, the two largest advertisers in the United States (Ex. 1), and internet postings on soft core porn and other sites (such as Ex. 2) not made by plaintiff cannot be conflated simply because defendants say it. They are not the same. Plaintiff does not advertise for prostitution because she is not in the business of prostitution, as her many customers attest. *See, e.g.*, Ex. 16. Tellingly, defendants must have reached the same conclusion by the time they filed the criminal complaint on October 31, 2012, which did not charge her with prostitution, but only with operating a massage business without a license and with not having her license conspicuously displayed. *See* Ex. 10.

**CONCLUSION**

Even without construing the evidence in the light most favorable to the plaintiff it would be difficult to conceive how defendants' conduct could be construed as objectively reasonable. They simply took a conclusion and built a case for probable cause by ignoring all evidence that did not fit their theory, providing misleading versions of evidence, and invented wholly nonsensical ("teepo") facts. Even if the court were to disregard the fact that the level of offense is a factor in the analysis (officers chasing a murderer will be given more leeway than those chasing a jaywalker), defendants' conduct demonstrates a serious disregard for constitutional niceties or judicial oversight of their actions. The illegal searches of plaintiff's house, car, phone, business, computers, person, and seizure of her money, belongings, business records and person, have (it is not disputed) never occurred with another suspected petty misdemeanant of non-Asian extraction in the history of San Juan County law enforcement.

Defendants' motion should be denied and the case should proceed to discovery.

Respectfully submitted,

TUCKER BURNS, YODER & HATFIELD


__/s/_Christian A. Hatfield___
CHRISTIAN A. HATFIELD
Attorney for Plaintiffs
105 North Orchard Avenue
Farmington, New Mexico 87401
(505) 325-7755